1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11
    RODERICK MURRAY, an individual, on          No. 1:18-cv-01492-LJO-SKO
12  behalf of the State of California, as a
    private attorney general, and on behalf of
13  all others similarly situated,

14                 Plaintiff,                    FINDINGS AND RECOMMENDATION
                                                 REGARDING PLAINTIFF'S MOTION FOR
15         v.                                    PRELIMINARY APPROVAL OF CLASS
                                                 ACTION SETTLEMENT
16  SCELZI ENTERPRISES, INC., a
    California Corporation; and DOES 1 to 50,    (Doc. 23)
17  inclusive,

18                 Defendant.

19

20         On August 27, 2019, Plaintiff Roderick Murray, individually and on behalf of all others

21  similarly situated ("Plaintiff"), filed an unopposed motion for preliminary approval of a class action

22  settlement.  (Doc. 23.)  The motion was referred to the undersigned magistrate judge for findings

23  and recommendation pursuant to 28 U.S.C. § 636(b).  The undersigned reviewed Plaintiff's papers

24  and all supporting material and found the matter suitable for decision without oral argument

25  pursuant to U.S. District Court for the Eastern District of California's Local Rule 230(g).  The

26  hearing set for October 9, 2019, was therefore VACATED.  (Doc. 26.)

27         For the reasons set forth below, the Court RECOMMENDS that Plaintiff's unopposed

28

                                                 1

motion for preliminary approval be DENIED without prejudice.

## I.     BACKGROUND

### A.     Factual and Procedural History

Defendant Scelzi Enterprises, Inc. ("Defendant" or "Scelzi") designs and manufactures truck bodies, including flatbeds, dump trucks, and water trucks, at its production facilities in California. (Doc. 23 at 9.) Defendant employed Plaintiff as a "break press operator," an hourly, non-exempt employee. (*Id.*; Doc. 7 ¶ 6.) Plaintiff alleges that Defendant failed to have a lawful rest period policy in place that informed its employees of their right to take duty-free rest periods and to make rest breaks available to its employees. (Doc. 7 ¶ 17.) Instead, according to Plaintiff, Defendant's rest period policy mandated that its employees "adhere to specific rules during their rest period," including the "direct order that they 'may not leave the work premises during the rest period.'" (*Id.* ¶ 17.) Plaintiff also alleges that employees were required to "remain on-call for any supervisorial instruction at any time" while on Defendant's premises. (*Id.*)

Plaintiff filed this putative class and representative action on October 26, 2018, alleging violations of California law. (Doc. 1.) On January 14, 2019, Defendant moved to dismiss Plaintiff's complaint. (Doc. 5.) Plaintiff filed his First Amended Complaint on January 31, 2019, thereby mooting Defendant's motion to dismiss. (Docs. 7, 10.) The First Amended Complaint, which is the operative complaint in this action, alleges the following causes of action: (1) failure to provide off-duty rest periods and/or pay rest break premiums, in violation of California Labor Code § 226.7 and California Industrial Welfare Commission (IWC) Wage Orders; (2) failure to issue accurate itemized wage statements, in violation of Labor Code §§ 226 and 226.3; (3) failure to pay all wages due upon termination, in violation of Labor Code §§ 201, 202, and 203; (4) violation of Business and Professions Code § 17200 *et seq.*; and (5) penalties under the Private Attorneys General Act (PAGA), Labor Code § 2698 *et seq.* (*Id.*)

Shortly thereafter, the parties agreed to engage in informal discovery and participate in a private mediation. (Doc. 23 at 10.) Prior to the mediation, the parties exchanged informal discovery, including information about the size of the putative class, the total number of workweeks worked by the putative class, and Defendant's rest period and dispute resolution

policies.  (*Id*.)  On May 28, 2019, the parties participated in a private medication with mediator Lisa Klerman.  (*Id*.)  The parties were unable to reach a settlement at the mediation but continued to engage in settlement discussions.  (*Id*.)

On June 7, 2019, Defendant filed a motion seeking to compel Plaintiff to submit his individual claims to arbitration and to dismiss Plaintiff's class and representative claims.  (Doc. 18.)  While Defendant's motion to compel arbitration was pending, the mediator informed the parties that a settlement had been reached.  (Doc. 23 at 10.)  The parties thereafter stipulated to vacate the hearing on the motion to compel arbitration and executed the settlement agreement currently before the Court (the "Proposed Settlement").  (Doc. 23-1.)

**B.     The Proposed Settlement**

The Proposed Settlement includes the following key provisions:

1.     <u>Settlement Class Definition</u>

For settlement purposes, the class is defined as "Plaintiff and all non-exempt hourly individuals who are or were employed by Scelzi or its predecessor or merged entities in California who were classified as non-exempt and who worked at least one shift longer than 3.5 hours at any time from October 26, 2014 through the date upon which the Court grants preliminary approval" (the "Settlement Class").  (Proposed Settlement § I.4, Doc. 23-1 at 33.)  The Settlement Class was estimated to include 682 members as of April 28, 2019.  (*Id*.; Decl. of Craig J. Ackermann ¶ 6, Doc. 23-1.)

2.     <u>Gross Settlement and Allocation</u>

Under the Proposed Settlement, Defendant agrees to establish a non-reversionary gross settlement fund of $350,000.00 ("Gross Settlement").  (Proposed Settlement § I.19, Doc. 23-1 at 35; Decl. of Craig J. Ackermann ¶ 3, Doc. 23-1.)  The parties propose allocation of the Gross Settlement as follows:

a.     An amount not to exceed $116,666.66, one-third of the Gross Settlement, for class counsel as attorney's fees;

b.     An amount not to exceed $14,000 for class counsel for costs and expenses;

c.     An amount not to exceed $10,000 for Plaintiff in consideration of his work as the

1  named plaintiff

2  d.  An amount estimated to be $15,000 to the third-party settlement administrator, CPT

3     Group, Inc.; and

4  e.  A $35,000 PAGA penalty, 75 percent ($26,250) of which would be paid to the

5     California Labor and Workforce Development Agency ("LWDA"), and 25 percent

6     ($8,750) of which would be paid to the Settlement Class.

7  (Proposed Settlement §§ IV, V, VII.1, Doc. 23-1 at 41–44, 48; Decl. of Craig J. Ackermann ¶ 3,

8  Doc. 23-1; Decl. of Roderick Murray ¶ 9, Doc. 23-3.)

9     3.  Net Settlement and Distribution

10    Accounting for all proposed distributions described above, Plaintiff estimates a net

11 settlement amount of $168,083.34 ("Net Settlement").  (Doc. 23 at 8; Decl. of Roderick Murray

12 ¶¶ 9–10, Doc. 23-3.)  The parties propose distribution of the Net Settlement to Settlement Class

13 members who do not request exclusion from the class based on the number of verified weeks

14 worked during the class period.  (Proposed Settlement § IV.3, Doc. 23-1 at 42; Decl. of Craig J.

15 Ackermann ¶ 48, Doc. 23-1.)   No claim form submission is required for Settlement Class

16 members to receive their shares of the settlement.  (Doc. 23 at 12; Decl. of Craig J. Ackermann ¶

17 3, Doc. 23-1.)  Any unpaid or unclaimed funds "will be disbursed subject to the provisions of

18 California Code of Civil Procedure § 384(b)(3)."  (Proposed Settlement § VII.4, Doc. 23-1 at 50.)

19    4.  Settlement Class Release

20    Settlement Class members who have not requested exclusion from the class each release

21 Defendant "and its predecessors, successors, assignees, current, former and future parents,

22 subsidiaries, affiliates, representatives, lawyers, insurers, reinsurers, accountants, agents,

23 partners, assigns, subrogees, officers, directors and employees" from "all claims, rights, demands,

24 liabilities, and/or causes of action and/or claims of every nature, whether known or unknown, that

25 were expressly asserted in the operative Complaint in the Action, or which could have been

26 alleged in the Complaint based upon or arising from the allegations in the Complaint."  (Proposed

27 Settlement §§ I.3, X.1, Doc. 23-1 at 32, 52.)  The released claims

28

include claims for violation of the California Labor Code alleged in the operative Complaint and those arising from facts alleged in the operative Complaint, including claims under Labor Code sections 201, 202, 203, 226, 226.7 or 2699 *et seq.*, claims under California Business & Professions Code Section 17200 *et seq.* based on the allegations and causes of action in the operative complaint, and the applicable Industrial Welfare Commission Wage Orders based on the allegations and causes of action in the operative complaint, or any similar state or federal law, statutory, constitutional, contractual or common law claims for wages, damages, unpaid costs or expenses, penalties, liquidated damages, interest, attorneys' fees, litigation costs, restitution, or equitable relief.

(*Id*. at 33.)

## II.     LEGAL STANDARDS

### A.     Preliminary Class Certification and Approval of Settlement Under Rule 23

Rule 23 mandates that, "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e). The following procedures apply to the court's review of the proposed settlement:

> The court must direct notice in a reasonable manner to all class members who would be bound by the proposal . . . .

> If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate . . . .

> The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

> [ . . . ]

> Any class member may object to the proposal if it requires court approval under this subdivision (e).

*Id.*

"Courts have long recognized that settlement class actions present unique due process concerns for absent class members." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (citation and internal quotations omitted). To protect the rights of absent class members, Rule 23(e) requires that the court approve all class action settlements "only after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *Bluetooth*, 654 F.3d at 946. However, when parties seek approval of a settlement agreement negotiated prior to formal class certification, "there is an even greater potential for a breach of

fiduciary duty owed the class during settlement." *Bluetooth*, 654 F.3d at 946. Thus, the court must review such agreements with "a more probing inquiry" for evidence of collusion or other conflicts of interest than what is normally required under the Federal Rules. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011); *see also Lane v. Facebook, Inc*., 696 F.3d 811, 819 (9th Cir. 2012).

Review of a proposed class action settlement ordinarily proceeds in three stages. *See* MANUAL FOR COMPLEX LITIGATION (4th) § 21.632. First, the court conducts a preliminary fairness evaluation and, if applicable, considers class certification. Second, if the court makes a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms, the parties are directed to prepare the notice of certification and proposed settlement to the class members. *Id*. (noting that if the parties move for both class certification and preliminary approval, the certification hearing and preliminary fairness evaluation can usually be combined). Third, the court holds a final fairness hearing to determine whether to approve the settlement. *Id*.; *see also Narouz v. Charter Commc'ns, LLC*, 591 F.3d 1261, 1266–67 (9th Cir. 2010). Though Rule 23 does not explicitly provide for such a procedure, federal courts generally find preliminary approval of settlement and notice to the proposed class appropriate if the proposed settlement "appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval." *Lounibos v. Keypoint Gov't Sols. Inc.*, Case No. 12–cv–00636–JST, 2014 WL 558675, at *5 (N.D. Cal. Feb. 10, 2014) (quoting *In re Tableware Antitrust Litig*., 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007) ); *see also* NEWBERG ON CLASS ACTIONS § 13:13 (5th ed. 2011); *Dearaujo v. Regis Corp*., Nos. 2:14-cv-01408-KJM-AC, 2:14-cv-01411-KJM-AC, 2016 WL 3549473 (E.D. Cal. June 30, 2016) ("Rule 23 provides no guidance, and actually foresees no procedure, but federal courts have generally adopted [the process of preliminarily certifying a settlement class].").

1. Preliminary Class Certification

Preliminary class certification is appropriate only if the classes and subclasses "meet the

four threshold requirements of Federal Rule of Civil Procedure 23(a): numerosity, commonality, typicality, and adequacy of representation." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 512 (9th Cir. 2013) (citing Fed. R. Civ. P. 23(a)). If Rule 23(a)'s threshold requirements are met, the proposed class must further satisfy Rule 23(b)(3)'s predominance and superiority requirements. Fed. R. Civ. P. 23(b)(3); *see Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997).

Whenever it reviews requests for class certification, the court "must pay 'undiluted, even heightened, attention' to class certification requirements . . . ." *Staton v. Boeing Co.*, 327 F.3d 938 at 952–53 (9th Cir. 2003) (citations omitted); *see Berry v. Baca*, No. CV 01-02069 DDP, 2005 WL 1030248, at *7 (C.D. Cal. May 2, 2005) (the parties cannot merely "agree to certify a class that clearly leaves any one requirement unfulfilled"). The plaintiff bears the burden of demonstrating that the requirements of Rule 23 have been satisfied as to the proposed class. *See Dukes*, 564 U.S. at 350; *Narouz*, 591 F.3d at 1266. As the Supreme Court explained,

> Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficient numerous parties, common questions of law or fact, etc. We recognized in *Falcon* that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," and that certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied."

*Dukes*, 564 U.S. at 350 (internal citations omitted) (italics in original). "A court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until [those requirements] have been met." Advisory Committee 2003 Note on Fed. R. Civ. P. 23(c)(1).

2. Preliminary Settlement Approval

As set forth above, a court may preliminarily approve a class action settlement under Rule 23(e) only if the settlement is fair, reasonable, and adequate. *Bluetooth*, 654 F.3d at 946. "[P]reliminary approval of a settlement has both a procedural and substantive component." *See, e.g., Tableware*, 484 F. Supp. 2d at 1079 (citing *Schwartz v. Dallas Cowboys Football Club, Ltd.*, 157 F. Supp. 2d 561, 570 n.12 (E.D. Pa. 2001)). In particular, preliminary approval of a settlement and notice to the proposed class is only appropriate if: (i) the proposed settlement

"appears to be the product of serious, informed, non-collusive negotiations"; and (ii) the settlement "falls within the range of possible approval," has "no obvious deficiencies," and does not "improperly grant preferential treatment" to class representatives or segments of the class. *Id.; see also Ross v. Bar None Enters.*, Inc., No. 2:13–cv–00234–KJM–KJN, 2014 WL 4109592, at *9 (E.D. Cal. Aug. 19, 2014). While it is not a court's province to "reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute," a court should weigh, among other factors, the strength of a plaintiff's case; the risk, expense, complexity, and likely duration of further litigation; the extent of discovery completed; and the value of the settlement offer. *Chem. Bank v. City of Seattle*, 955 F.2d 1268, 1291 (9th Cir. 1992); *see also Officers for Justice v. Civil Serv. Comm'n of City & Cty. of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982).

## III. DISCUSSION

### A. Rule 23(a) Requirements

#### 1. Numerosity

The numerosity requirement is satisfied where "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). This requires the Court to consider "specific facts of each case and imposes no absolute limitations." *General Tel. Co. v. EEOC*, 446 U.S. 318, 330 (1980). Courts interpreting the numerosity requirement have identified a variety of factors relevant to whether joinder of all class members would be impracticable including: (1) the number of individual class members; (2) the ease of identifying and contacting class members; (3) the geographical spread of class members; and (4) the ability and willingness of individual members to bring claims, as affected by their financial resources, the size of the claims, and their fear of retaliation in light of an ongoing relationship with the defendant. *See, e.g., Twegbe v. Pharmaca Integrative Pharm., Inc.*, No. CV 12-5080 CRB, 2013 WL 3802807, at *2 (N.D. Cal. July 17, 2013).

Here, Plaintiff asserts that, based on information supplied by Defendant prior to mediation, there are approximately 682 members in the Settlement Class. (Decl. of Craig J. Ackermann ¶ 6, Doc. 23-1.) The class is readily ascertainable because all class members have worked for

Defendant and can be easily identified through Defendant's records.  (*Id.* at ¶ 39.)  Because the joinder of 682 plaintiffs would be impracticable, the Court finds that this showing with respect to numerosity is adequate to meet the requirements of Rule 23(a)(1).  *See, e.g., Collins v. Cargill Meat Sols. Corp.*, 274 F.R.D. 294, 300 (E.D. Cal. 2011) ("Courts have routinely found the numerosity requirement satisfied when the class comprises 40 or more members.").

### 2.    Commonality

The commonality requirement of Rule 23(a)(2) is met where "the class members' claims 'depend upon a common contention' such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each [claim] with one stroke.'"  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (quoting *Dukes*, 564 U.S. at 350).  Thus, a plaintiff seeking to certify a class must "demonstrate 'the capacity of classwide proceedings to generate common answers' to common questions of law or fact that are 'apt to drive the resolution of the litigation.'"  *Id.* (quoting *Dukes*, 564 U.S. at 350, (internal quotation and citation omitted) ).  "[C]ommonality only requires a single significant question of law or fact."  *Id.* at 589 (citation omitted).  "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class."  *Hanlon*, 150 F.3d at 1019.  So long as there are common questions of law or fact that are susceptible to resolution by common proof, Rule 23(a)(2)'s commonality requirement is met.  *Cf. Dukes*, 564 U.S. at 353 (finding insufficient commonality where "significant proof that Wal-Mart operated under a general policy of discrimination" was "entirely absent").

Plaintiff's motion devotes a single sentence to the issue of commonality, stating that "[w]hile the [p]arties dispute whether a [c]lass would be appropriate if the litigation were to continue, they agree, for the purposes of settlement, that the [c]lass may be subject to common rest break, wage statement, and waiting time practices."  (Doc. 23 at 16 (citing Decl. of Craig J. Ackermann ¶ 40, Doc. 23-1).)  While commonality can exist where a defendant has a uniformly-applied on-duty break policy or practice that allegedly violates California law, *see, e.g., Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 961–63 (9th Cir. 2013), the parties' assertion that the Settlement Class "may" be subject to a common practice is, without more, inadequate to

demonstrate commonality. Plaintiff has submitted no evidence demonstrating the existence of any "common rest break, wage statement, and waiting time practices" or the applicability of such practices in a manner such that class-wide liability could be determined by facts common to all members of the Settlement Class. *See Dukes*, 564 U.S. at 350. Without a more detailed and factually-supported elaboration regarding the practices alleged in the First Amended Complaint and the application of those practices to the Settlement Class, the undersigned cannot conclude that there are no "dissimilarities within the proposed class" that "have the potential to impede the generation of commons answers." *Id.* (citation and internal quotation marks omitted). Because Plaintiff has not yet shown that class treatment will generate common answers apt to drive the resolution of the litigation, the requirement of commonality is not met.

### 3.    Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class [.]" Typicality "refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011). Typicality, in other words, tests "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quoting *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985)). Part of the controlling concern is whether "there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Id.* The "commonality and typicality requirements occasionally merge: 'Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) (quoting *Dukes*, 564 U.S. at 349 n.5).

Plaintiff contends that the typicality requirement is satisfied because he "asserts rest break and other derivative claims [] regarding Defendant's compensation and employment policies that

are common and at the core of this lawsuit." (Doc. 23 at 16 (citing Decl. of Craig J. Ackermann ¶ 40, Doc. 23-1).) This bare contention does not establish that Plaintiff's experience with Defendant is typical or that the putative class injuries are "based on conduct which is not unique to the named plaintiff[]." Further, as explained above with respect to commonality, Plaintiff has not provided any evidence that members of the Settlement Class were injured by the same course of conduct by Defendant. Indeed, the First Amended Complaint appears to belie that contention, as Defendant's conduct in the First Amended Complaint is alleged to have affected some members of the Settlement Class and not others. *See* Doc. 7 ¶¶ 48 (alleging that Defendant's conduct caused "subclass members" to incur economic damages). Accordingly, Plaintiff has failed to show the typicality requirement is met in this case.

### 4. Adequacy of Representation

To fulfill the adequacy requirement, the named plaintiff must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To determine whether the named plaintiff will adequately represent the class, courts ask two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020. Indicia of adequacy include, "among other factors, an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees." *Ellis*, 657 F.3d at 985 (citations omitted). Review of the adequacy of representation is "especially critical when the class settlement is tendered along with a motion for class certification." *Hanlon*, 150 F.3d at 1020.

Plaintiff states that his counsel "both separately and together, have significant experience litigating class actions and have been certified by numerous state and federal courts as competent and adequate class counsel, including in a number of on-premises rest break class actions." (Doc. No. 23 at 17 (citing Decl. of Craig J. Ackermann ¶¶41, 54–67, Doc. 23-1; Decl. of Jonathan Melmed ¶¶ 4–8, Doc. 23-1).) The "qualifications of counsel for the representatives" is, in fact, one of several factors that the court must consider to determine adequacy, *Brown v. Ticor Title Ins. Co.*, 982 F.2d 386, 390 (9th Cir. 1992), and there is no reason at this stage to doubt that

Plaintiff's counsel is competent to prosecute the action.

The undersigned is more concerned, however, about the named Plaintiff and his counsel's ability to fairly and adequately protect the class. "[A] class representative must be part of the class and possess the same interest and injury as the class members." *Amchem*, 521 U.S. at 626 (internal citations omitted). Based on the information submitted, it is not clear that Plaintiff is an adequate representative of the class, nor that the potential class members have suffered the same injury as Plaintiff or possess same interests as Plaintiff. (*See* Section III.A.2 & 3, *supra*.) This is particularly true with respect to Plaintiff's claim for waiting time penalties under Cal. Labor Code § 201 *et seq.*, which applies only to Settlement Class members whose employment with Defendant ended during the class period. There is no evidence in the record from which the undersigned can conclude Plaintiff falls within this category. In any event, given the potential for current- and former-employee Settlement Class members to have divergent interests, subclasses with separate representatives may be necessitated to adequately protect these members' respective interests. *See* MANUAL FOR COMPLEX LITIGATION (4th) § 21.123. In fact, as observed above, the First Amended Complaint contemplates the certification of "subclasses" in this case. *See, e.g.,* Doc. 7 ¶ 44, 54.

Even if Plaintiff does demonstrate he meets all of the characteristics of the Settlement Class members, however, questions still remain as to Plaintiff's ability to adequately represent the Settlement Class. The undersigned is puzzled, if not troubled, by Plaintiff's statement in his declaration that "I understand that my duties as the Class representative are to look out for the interests of the *other drivers* in this case both in any settlement any [sic] litigation as a whole."[1] (Decl. of Roderick Murray ¶ 2) (emphasis added). Yet Plaintiff is alleged to have been employed by Defendant during the class period as a "break press operator," *see* Doc. 7 ¶ 6, Doc. 23 at 9, Decl. of Roderick Murray ¶ 4, and Defendant is alleged to be in the business of designing and manufacturing truck bodies, *see* Doc. 23 at 9; Decl. of Craig J. Ackermann ¶ 4. Thus, it does not

---

[1] The declaration of Plaintiff's counsel contains a similar reference to "drivers," without any factual support. (*See* Decl. of Craig Ackermann ¶ 39 ("Defendant has informed Plaintiff's counsel that the proposed class consists of approximately 682 current and former drivers who can be readily identified through Defendant's records, as of the date of the mediation.").)

appear Plaintiff held the position of "driver" while employed by Defendant during the class period, nor is it clear that Defendant employed any "drivers" or why they would comprise part of the Settlement Class. While this discrepancy may simply be typographical, it nevertheless underscores the necessity of close judicial scrutiny of pre-certification settlement agreement to ensure that divergent interests amongst class members are considered and accommodated and that the named plaintiff and counsel fairly and adequately represent the interests of <u>all</u> class members. *Hanlon*, 150 F.3d at 1026. Based on the record before the undersigned, the court cannot find that Rule 23(a)(4)'s adequacy requirement has been met in this case.

In sum, as Plaintiff has failed to show commonality, typicality, or adequacy of representation, the undersigned finds Plaintiff has not satisfied Rule 23(a)'s prerequisites.

**B.    Rule 23(b) Requirements**

Plaintiff seeks certification under Rule 23(b)(3), which requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see also Amchem*, 521 U.S. at 615. The test of Rule 23(b)(3) is "far more demanding," than that of Rule 23(a). *Wolin v. Jaguar Land Rover N. Am.*, LLC, 617 F.3d 1168, 1172 (9th Cir. 2010) (quoting *Amchem*, 521 U.S. at 623–24).

**1.    Predominance**

The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. Predominance is a similar inquiry to commonality but requires a heightened showing that facts and issues common to the class predominate over any individual issues that might be present. *See* Fed. R. Civ. P. 23(b)(3); *Hanlon*, 150 F.3d at 1019. The main concern is the "balance between individual and common issues." *Mevorah v. Wells Fargo Home Mortg. (In re Wells Fargo Home Mortg. Overtime Pay Litig.)*, 571 F.3d 953, 959 (9th Cir. 2009). Rule 23(b)(3) requires a showing that "questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 459 (2013).

1    Plaintiff seeks to certify a settlement class with respect to his cause of action for rest period

2    violations, non-compliant wage statements, waiting time penalties, and unfair business practices.

3    (*See generally* Doc. 23.)  An internal policy alone will not satisfy the predominance inquiry.  *See*

4    *Vinole v. Countrywide Home Loans, Inc*., 571 F.3d 935, 946 (9th Cir. 2009) (stating "a district

5    court abuses its discretion in relying on an internal uniform exemption policy to the near exclusion

6    of other factors relevant to the predominance inquiry"); *Ordonez v. Radio Shack, Inc.,* No. CV

7    10–7060–CAS (JCGx), 2013 WL 210223, at *11 (C.D. Cal. Jan. 17, 2013).  Rather, that policy

8    must be "*consistently applied* to a group of employees is in violation of the wage and hour laws"

9    in order to be found suitable for class treatment.  *Brinker Rest. Corp. v. Superior Court*, 53 Cal.

10   4th 1004, 1033 (2012) (emphasis added).   The Court must determine whether Defendant's

11   policies or practices were consistently applied such that "questions common to the class

12   predominate" Plaintiff's claims.  *See Amgen*, 568 U.S. at 459.

13              a.      Rest Period Policy

14   Plaintiff contends that "common issues predominate with respect to [his] claims that

15   Defendant promulgated an unlawful on-premises rest break policy." (Doc. 23 at 17.)  He alleges

16   in his First Amended Complaint that Defendant's rest policy violates California law because it

17   "advised Plaintiff, the Class Members, and all Aggrieved Employees to take rest breaks on-site

18   and to remain on duty during their rest periods," citing *Augustus v. ABM Security Services, Inc.*,

19   2 Cal. 5th 257, 269 (2016).[2]  (Doc. 7 ¶¶ 17, 19.)

20   In *Augustus*, the California Supreme Court held that "during rest periods[,] employers must

21   relieve employees of all duties and relinquish control over how employees spend their time."  2

22   Cal. 5th 257, 269 (2016).  Plaintiff has submitted no evidence of a policy or practice under which

23   Defendant's employees were uniformly subject to employer control during their rest breaks.[3]  To

---

24   [2] Under California law, an employer must provide rest periods in accordance with applicable statutes, regulations,
and IWC Wage Orders.  Cal. Lab. Code § 226.7(b).  The applicable IWC Wage Order provides that the rest period
25   "shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major
fraction thereof," unless the total work time is less than three and one-half hours.  IWC Wage Order No. 1-2001.
26   [3] The undersigned expresses no opinion as to whether Defendant's alleged rest break policy violates California law
in view of the California Supreme Court's holding in *Augustus*.  While the court looks to the merits of a plaintiff's
27   underlying claim to determine whether predominance exists for the purposes of Rule 23, it does not, at this stage,
"judge the validity of [plaintiffs'] claims."  *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. &*
28   *Serv. Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co*., 593 F.3d 802, 808 (9th Cir. 2010) (reversing denial

the contrary, it appears that Defendant's "on-premises rest policy" was not uniformly applied. Plaintiff himself points out in the motion that "[a]t mediation, Defendant's counsel produced approximately one hundred declarations from [Settlement] Class [m]embers stating that they could, in fact, leave the premises during their rest breaks and suggested that they could probably obtain signed declarations for at least one quarter of the [Settlement] Class." (Doc. 23 at 23, 25, 26; *see also* Decl. of Craig J. Ackermann ¶ 30.) In the absence of any evidence showing a uniform policy or practice, as these declarations suggest, identifying rest period violations would likely require an individual analysis. The Court would have to ascertain whether Defendant took measures to require an employee to remain on site, the nature of such measures, and whether the employee chose to remain on site for reasons other than those measures. *See, e.g., Vazquez v. Kraft Heinz Foods Co*., Case No. 16-cv-2749-WQH-BLM, 2018 WL 4896072, at *12 (S.D. Cal. Oct. 9, 2018) (denying motion to certify rest period subclass where the record contained "no evidence of a policy limiting the movements of the employees during the rest periods."); *Ritenour v. Carrington Mortg. Servs., LLC*, No. SACV 16-02011-CJC(DFMx), 2018 WL 5858658, at *8 (C.D. Cal. Sept. 12, 2018) (finding no predominance where the plaintiffs failed to show the defendant had an on-site rest period policy that was facially invalid under *Augustus* or one that was applied uniformly to the putative class members). *See also Dawson v. Hertz Transporting, Inc.*, Case No. CV 17-8766-GW(JEMx), 2018 WL 6112623, at *7 (C.D. Cal. Nov. 5, 2018); *Schroeder v. Envoy Air, Inc.,* No. CV 16-4911-MWF (KSx), 2017 WL 3835804, at *10 (C.D. Cal. Aug. 30, 2017) (denying class certification, finding "[t]he evidence of any on-call policy by Envoy is equivocal at best and . . . . apparently will require the taking of individualized testimony by numerous employees and higher-ups in the company. Even if the existence of the policy were to present a common question, Plaintiffs cannot meet the predominance requirement because proving up Plaintiffs' claims would overwhelm the Court with individualized issues.").

---

of class certification because "the district court not only 'judge[d] the validity" of plaintiffs'" on duty" claims, it did so using a nearly insurmountable standard, concluding that merely because it was not assured that plaintiffs would prevail on their primary legal theory, that theory was not the appropriate basis for the predominance inquiry."). *See also Amgen,* 568 U.S. at 466 ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage . . . . Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites . . . . are satisfied.").

As discussed above with respect to commonality, without any "heightened showing" of the existence of a uniformly-applied on-duty rest break policy or practice, *cf. Wright v. Renzenberger, Inc.*, Case No. CV 13-6642 FMO (AGRx), 2017 WL 9831398, at *5 (C.D. Cal. Sept. 30, 2017) (finding typicality and certifying class where the plaintiffs "provided substantial evidence that, as a matter of uniform policy," the defendant instructed employees to take rest breaks while on premises and "counted" that time as rest periods), the undersigned cannot at this time conclude that Plaintiff's rest period claim is appropriate for classwide resolution.

### b. Wage Statements, Waiting Time Penalties, and Unfair Business Practices

Plaintiff also seeks to certify a settlement class with respect to his wage statement claim (Labor Code §§ 226 and 226.3), waiting time penalties (Labor Code §§ 201, 202, and 203), and unfair business practices claim (Business and Professions Code § 17200 *et seq.*). (*See generally* Doc. 23.) Plaintiff concedes in his motion that these claims are "derivative" of his rest break claim. (*Id.* at 16, 21, 25 (characterizing Plaintiff's waiting time penalty and wage statement claims as "premised on Defendant's on-premises rest break policy and failure to pay rest break premiums.").) Because the rest period claim will require individualized inquiry, so will these derivative claims. *See Ritenour*, 2018 WL 5858658, at *9–10; *Burnell v. Swift Transp. Co. of Ariz., LLC*, EDCV 10–809–VAP (SPx), 2016 WL 2621616, at *5 (C.D. Cal. May 4, 2016) (finding that "wage statement claim, . . . § 203 claim, and UCL claim are derivative of . . . meal and rest period claims and cannot be adjudicated on a class basis for the same reasons"). This is particularly true in the case of the waiting time penalty claim, which is only relevant to members of the Settlement Class who no longer work for Defendant; it does not apply to those class members who are currently employees. *See Roberts v. Marshalls of CA*, LLC, Case No. 13-cv-04731-MEJ, 2017 WL 1152967, at *10 (N.D. Cal. Mar. 28, 2017) (finding class certification pursuant to Rule 23(b)(3) not warranted where "[d]ifferent class members seek different relief by virtue of their status as either a managerial or non-managerial employee or as a current or former employee.").

### 2. Superiority

Rule 23(b)(3) also requires a court to find "a class action is superior to other available

methods for the fair adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). In resolving the Rule 23(b)(3) superiority inquiry, the court should consider "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *Id.; see Amchem*, 521 U.S. at 616. Where the parties have agreed to pre-certification settlement, however, there is no need to consider the "likely difficulties in managing a class action." *Amchem*, 521 U.S. at 620. Rather, the focus shifts to those requirements that are "designed to protect absentees by blocking unwarranted or overbroad class definitions." *Id.*

Plaintiff asserts "the superiority requirement is satisfied because it would be highly inefficient for 682 Class Members to file individual cases; certification will provide the Class with a viable method of obtaining redress for their relatively modest individual damages; and public policy supports the use of the class action device to secure the enforcement of statutes that focus on the workplace." (Doc. 23 at 18.) While the consolidation of approximately 682 potential individual actions into a single proceeding would undoubtedly enable a more efficient management of this litigation, Plaintiff's motion fails to consider that, in addition to litigation, arbitration is also a potential means to adjudicate the dispute (at least according to Defendant, *see* Doc. 18). There is no mention—much less analysis—of how a class action is superior to arbitration in this case, particularly where arbitration could be conducted on behalf of multiple claimants at one time and is typically less costly and more efficient than litigation.

In sum, based on the foregoing analysis, the undersigned finds that Plaintiff also has not met his burden under Rule 23(b)(3).

## C. Preliminary Fairness Determination

Plaintiff contends the court's scrutiny for purposes of preliminary approval of the settlement "should be 'limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties and that the settlement, taken as a whole, is fair, reasonable and adequate in all concerned." (Doc. 23 at

18 (quoting *Officers for Justice*, 668 F.3d at 625).)  But, as this Court recently has clarified, it agrees with the observation of another California district court, that "the idea that district courts should conduct a more lax inquiry at the preliminary approval stage seems wrong" and lacks a compelling rationale.  *Cotter v. Lyft, Inc.*, 193 F. Supp. 3d 1030, 1036 (N.D. Cal. 2016).  Rather, in light of the court's duty to absent class members, this court opts to "review class action settlements just as carefully at the initial stage as [it] do[es] at the final stage."  *Id.* at 1037; *see Smothers v. Northstar Alarm Servs*., LLC, No. 2:17-cv-00548-KJM-KJN, 2019 WL 280294, at *10 (E.D. Cal. Jan. 22, 2019).

Under Rule 23(e), a court may approve a class action settlement only if the settlement is fair, reasonable, and adequate.  Fed. R. Civ. P. 23(e)(2); *Bluetooth*, 654 F.3d at 946.  Although the court must weigh several factors to approve a settlement, additional factors may be relevant depending on the context of the case and the terms of the agreement.  *See Bluetooth*, 654 F.3d at 946 ("The factors in a court's fairness assessment will naturally vary from case to case . . . .).  Here, the undersigned is troubled by several aspects of the Proposed Settlement that cast doubt on its fairness, as explained below.

### 1.     Valuation of the Settlement

In calculating the maximum potential recovery for the class, Plaintiff's counsel declares that the total potential recovery for the rest break claim is $4,286,490; the total for the "waiting time penalties" is $1,120,080; the total for the "wage statement penalties" is $1,927,000; and the total PAGA penalties is $3,143,940.  (Decl. of Craig J. Ackermann ¶¶ 21, 23, 25, 28.)  The sum of these amounts equals $10,477,510.  The Gross Settlement here is for $350,000—just 3.3 percent of the total potential recovery for Plaintiff's claims.  When the total potential recovery is compared to the estimated Net Settlement of $168,083.34, that percentage drops to 1.6.  While Plaintiff defends the Gross Settlement amount as "more than 100% of the risk-adjusted settlement value of the claims" (Doc. 23 at 28), review of Plaintiff's methodology, which results in these low percentages, demonstrates that the calculation of such risk-adjusted settlement value suffers from serious problems, such that the undersigned cannot find that the Proposed Settlement is fair and reasonable, particularly given the percentages identified above.

a.    <u>Rest Break Claim</u>

Plaintiff's counsel declares Defendant's "maximum exposure" on his rest break claim is $4,286,490. (Decl. of Craig J. Ackermann ¶ 21.) According to Plaintiff, considering Defendant's factual and legal arguments, Defendant's "realistic, risk-adjusted exposure" amounts to $108,501.77. (*Id.* ¶ 38.) Among the various "discounts" applied to the potential value of Plaintiff's rest break claim is an 85 percent reduction "to account for the risk of Defendant compelling Plaintiff's case to individual arbitration." (Doc. 23 at 23.) As Plaintiff acknowledges, Defendant has taken the position in this litigation that Plaintiff and the Settlement Class have signed individual arbitration agreements with class action waivers. (*Id. See also* Doc. 18 (Defendant's motion to compel arbitration).) Plaintiff asserts that "[i]f enforced by the Court, these arbitration agreements would eliminate all of the claims at issue other than Plaintiff's PAGA penalty claims (which are not subject to arbitration), as all other claims would be compelled to individual arbitration." (Doc. 23 at 23.) Thus, "[t]he arbitration agreements for all Class Members [] posed a very serious risk of recovery and could have (and potentially would have) wiped out all claims, except for PAGA penalty claim." *Id.* Plaintiff further asserts an additional 25 percent discount to account for the risk that the Court would deny class certification in this case, similarly asserting that this would eliminate all of the Settlement Class members' claims. (*Id.* at 25.)

In reducing the potential value of his rest break claim in this way, Plaintiff conflates the Settlement Class members' ability to litigate claims with Defendant's potential exposure for that claim. Plaintiff assumes that in event the Settlement Class members are not able to pursue their rest break through a class action, that claim has been effectively "wiped out," discounting the value of these claims to zero. This, however, fails to account for the potential for individual Settlement Class members to pursue their respective rest break claims in arbitration or in individual lawsuits. Plaintiff has provided no support for the assumption that, in the event the claims cannot be adjudicated through a class action, they have no value.[4] Without any analysis

---

[4] In the case of arbitration, the Court notes that the arbitration agreement at issue provides that Defendant will bear the costs of the arbitration, *see* Doc. 18-2 at 8, thereby potentially increasing the likelihood that more Settlement Class members would participate.

1    as to the number of Settlement Class members who would potentially proceed with their rest

2    break claims individually, the undersigned cannot determine whether the Proposed Settlement is

3    reasonable as to that claim.

4           b.      Wage Statement Claim and Waiting Time Penalties

5           Plaintiff asserts that Defendant's maximum exposure for Plaintiff's wage statement claim

6    and waiting time penalties is $1,927,000 and $1,120,080, respectively.  (Doc. 23 at 20–21; Decl.

7    of Craig J. Ackermann ¶¶ 21, 25, Doc. 23-1.)  Yet Plaintiff assigns **no value** to these claims in

8    settlement.  (*See* Doc. 23 at 25–26; Decl. of Craig J. Ackermann ¶¶ 26, 38, Doc. 23-1)  Some of

9    purported justifications for deeming these claims valueless are predicated on the same

10   unsupported assumption identified above.  (*See* Doc. 23 at 25 (these claims "would be subject to

11   Defendant's individual arbitration agreements with Class Members, *thus rendering them largely*

12   *worthless in litigation*." (emphasis added).)  Others are based on admittedly unsettled law.  (*See*

13   *id*. at 26 (asserting that the derivative claims have no value because there is a risk they could not

14   be maintained in the absence of injury, yet also noting that "[t]his is an open issue under California

15   law with the law in flux.")  It does not follow from any of these justifications that these claims

16   should be discounted to zero.

17          Moreover, these claims are inappropriate to include in the Proposed Settlement in the

18   current version.  As set forth above, the waiting time penalty claim is only relevant to members

19   of the Settlement Class who no longer work for Defendant.  Since it is unclear whether Plaintiff

20   falls within that group, it cannot be said that he is adequately situated to litigate, much less release,

21   that claim.  Moreover, alleging claims that Plaintiff believes are meritless and "largely worthless

22   in litigation" may violate Rule 11.  *See* Fed. R. Civ. P. 11(b)(2) (noting legal contentions must be

23   "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing

24   existing law or for establishing new law").  In any event, the undersigned cannot recommend the

25   approval of the settlement of the wage statement claim and waiting time penalties in the Proposed

26   Settlement as currently structured.

27          c.      PAGA Claim

28          The Proposed Settlement here is for $350,000, with an estimated $168,083.34 to be

20

distributed amongst 682 class members. (Doc. 23 at 8.) In calculating the maximum potential recovery for the class, Plaintiff's counsel declares that the total potential recovery for the rest break claim is $4,286,490; the total for the waiting time penalties is $1,120,080; the total for the wage statement penalties is $1,927,000; and the total PAGA penalties is $3,143,940. (Decl. of Craig J. Ackermann ¶¶ 21, 23, 25, 28.) While he sum of these amounts equals $10,477,510, Plaintiff's counsel reports the total potential recovery as $7,333,570, *id.* ¶ 28; *see also* Doc. 23 at 2. In so doing, counsel improperly omits the $3,143,940 estimated maximum potential value of the PAGA claim.

The PAGA statute requires trial courts to "review and approve" any settlement of PAGA claims. Cal. Lab. Code § 2699(l)(2).[5] In the absence of authority governing the standard of review of PAGA settlements, the LWDA has in one action provided some guidance to the court. *O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1133 (N.D. Cal. 2016). There, where both class action and PAGA claims were covered by a proposed settlement, the LWDA acknowledged that it was "not aware any existing case law established a specific benchmark for PAGA settlements, either on their own terms or in relation to the recovery on other claims in the action" but stressed that:

> [W]hen a PAGA claim is settled, the relief provided for under the PAGA be genuine and meaningful, consistent with the underlying purpose of the statute to benefit the public and, in the context of a class action, the court evaluate whether the settlement meets the standards of being "fundamentally fair, reasonable, and adequate" with reference to the public policies underlying the PAGA.

*Id.*; *see also Sanchez v. Frito-Lay, Inc.*, No. 1:14-cv-00797-DAD-BAM, 2019 WL 4828775, at *12 (E.D. Cal. Sept. 30, 2019). Recognizing the distinct issues presented by class actions, the undersigned is persuaded by the LWDA's reasoning expressed in *O'Connor* and therefore shall evaluate the Proposed Settlement of PAGA claims according to whether the settlement terms (1) meet the statutory requirements set forth by PAGA, and (2) are fundamentally fair, reasonable, and adequate in view of PAGA's public policy goals. *See Sanchez*, 2019 WL 4828775 at *12.

First, Plaintiff cites no authority that PAGA penalties should not be considered in the total

---

[5] The proposed settlement must also be submitted to the LWDA at the same time it is submitted to the court. *Id.*

estimated value of the class claims. While the damages awarded under PAGA do not inure entirely to the benefit of the class, courts have held that the full amount of the awardable penalties should be considered in establishing the fairness of the settlement. "Just because the State would receive [seventy-five percent of the penalty] doesn't mean it's not part of the penalty. To the contrary, a PAGA plaintiff stands in the shoes of the State in enforcing its wage and hour laws." *Cotter*, 176 F. Supp. 3d at 942. "[I]t makes no sense to simply erase the State's portion of the recovery when estimating the maximum value of the claim." *Id.*

Moreover, Plaintiffs seek to settle the PAGA claim for $35,000—75 percent paid to the LWDA and 25 percent to the Settlement Class—despite asserting its maximum value is $3,143,940. This $3,143,940 amount makes up 30 percent of the total verdict value of the case. Yet Plaintiff proposes settling the PAGA claim for *1.1 percent* of its estimated full worth. Plaintiff offers no rationale for settling the PAGA claim for such a relatively meager value. *See O'Connor*, 201 F. Supp. 3d at 1133–34 (rejecting a proposal to settle PAGA claims for $1 million where counsel previously valued them at over $1 billion, noting the court's concern that the PAGA claim was being used "simply as a bargaining chip in obtaining a global settlement for Uber's benefit, even though the PAGA claim alone is worth more than half of the full verdict value of all claims being released."). Nor has Plaintiff established that a copy of the Proposed Settlement was provided to the LWDA at the same time it was submitted to the Court, as required by Cal. Lab. Code § 2699(l)(2).

Comparison of the $35,000 PAGA settlement to the alleged discounted value of those claims further demonstrates its unreasonableness. Plaintiff's counsel estimates the PAGA penalties at a risk-adjusted value of $177,409.12. As justification for this significant, 70 percent reduction from the $3,143,940 total value, Plaintiff points to the Court's discretion to reduce the amount of PAGA penalties, along with the fact that Plaintiff would not be able to recover PAGA penalties if he were unable to prevail on his claims under the Labor Code. Both of these points are correct: trial courts retain discretion concerning the amount of PAGA penalties to be awarded, *see* Cal. Labor Code § 2699(e)(2) (noting "a court may award a lesser amount than the maximum civil penalty amount specified by this part if, based on the facts and circumstances of the

particular case, to do otherwise would result in an award that is unjust, arbitrary and oppressive, or confiscatory"), and PAGA penalties would be unavailable were Plaintiff unable to prevail on his claims for rest break violations, incorrect wage statements, and waiting time penalties, *see id.* §2699(a). However, as explained above, the undersigned finds the assessment of the risk of prevailing on Plaintiff's Labor Code claims flawed, which renders excessive the 70 percent total discount on the PAGA penalties. (*See* Doc. 23 at 27, 28.) Moreover, Plaintiff has not adequately explained aspects of the 70 percent discount, such as how two separate deductions of 50 percent under section 2699(e)(2) do not result in double counting.[6] (*See id.* 26, 27.)

The above issues demonstrate that the total value of the PAGA penalties (and, in fact, all of the claims) have been discounted in an amount in excess of what is reasonable. Apportioning $35,000 of the Proposed Settlement toward PAGA claim that has a discounted value of $177,409.12 (19.7 percent) may very well be reasonable; apportioning that same amount of the Proposed Settlement toward PAGA claim that has a value of $3,143,940 (1.1 percent) is not. *See O'Connor*, 201 F. Supp. 3d at 1134–35. The failure to adequately explain why the PAGA penalties were not considered in the calculation of the total value of the suit and the overly-excessive discounts on those penalties prevents the undersigned from any "real evaluation of the reasonableness of this settlement." *See Gonzalez v. CoreCivic of Tennessee, LLC*, No. 1:16-cv-01891-DAD-JLT, 2018 WL 4388425, at *9 (E.D. Cal. Sept. 13, 2018). Accordingly, absent further explanation by the parties, the undersigned declines to recommend for preliminary approval the PAGA penalties called for in the Proposed Settlement as fair, reasonable, and adequate.

        d.    <u>Summary</u>

In light of the foregoing, the undersigned cannot conclude that Plaintiff has made an adequate showing sufficient to warrant a preliminary finding that the Proposed Settlement is fair, reasonable, and adequate. As set forth above, the Gross Settlement amount here is for $350,000—

---

[6] Plaintiff asserts that one of the 50 percent discounts is due to Defendant counsel's representation that Defendant was experiencing some "financial difficulties." (Decl. of Craig J. Ackermann ¶ 37.) Plaintiff has not shown, however, that these unspecified financial difficulties would cause Defendant unable to pay PAGA penalties should liability be found.

just 3.3 percent of the total potential recovery for Plaintiff's claims.  Although it is true that a settlement agreement amounting to a low percentage of the class's potential recovery does not render the agreement *per se* inadequate or unfair, *see Officers for Justice*, 688 F.2d at 628, the settlement value as proposed appears to represent an overly-aggressive discounting of the claims in this case.  Procedurally, this raises concerns about whether Plaintiff's counsel adequately represented the interests of the absent putative class members in settlement negotiations and the extent to which the Proposed Settlement is the product of a well-informed negotiation.  Substantively, such an aggressive discounting of the putative class's claims presents an impediment to the fairness and reasonableness determination.  To address whether a proposed settlement is substantively fair or adequate, courts must "consider plaintiffs' expected recovery balanced against the value of the settlement offer." *Tableware,* 484 F. Supp. 2d at 1080.  Here, Plaintiff asserts that the Proposed Settlement "represents more than 100% of the risk-adjusted settlement value of the claims" (Doc. 23 at 28), yet it is clear that this "risk-adjusted" value is not an accurate assessment of Defendant's exposure for Plaintiff's claims.  In the absence of an accurate valuation of Plaintiff's claims, the undersigned is unable to balance the Proposed Settlement against the expected recovery of those claims and therefore cannot find that the Proposed Settlement is reasonable or "within the range of possible approval." *Tableware,* 484 F. Supp. 2d at 1079.

### 2. Class Release

The terms of Class Release in the Proposed Settlement raises serious due process concerns with respect to absent class members.  It proposes a release by the Settlement Class of

> claims for violation of the California Labor Code alleged in the operative Complaint and those arising from facts alleged in the operative Complaint, including claims under Labor Code sections 201, 202, 203, 226, 226.7 or 2699 et seq., claims under California Business & Professions Code Section 17200 et seq. based on the allegations and causes of action in the operative complaint, and the applicable Industrial Welfare Commission Wage Orders based on the allegations and causes of action in the operative complaint, *or any similar state or federal law, statutory, constitutional, contractual or common law claims for wages, damages, unpaid costs or expenses, penalties, liquidated damages, interest, attorneys' fees, litigation costs, restitution, or equitable relief.*

(Proposed Settlement § I.3, Doc. 23-1 at 33 (emphasis added).)  It is not clear to what the term "similar" applies.  Limiting it to claims that are similar to "the applicable Industrial Welfare Commission Wage Orders" does not appear to make sense, as the IWC Wage Orders do not create and are not themselves causes of action.  A more reasonable interpretation is that "similar" applies to all of the foregoing sources of law, *i.e.*, "claims for violation of the California Labor Code alleged in the operative Complaint and those arising from facts alleged in the operative Complaint, including claims under Labor Code sections 201, 202, 203, 226, 226.7 or 2699"; "claims under California Business & Professions Code Section 17200 et seq. based on the allegations and causes of action in the operative complaint"; and "the applicable Industrial Welfare Commission Wage Orders based on the allegations and causes of action in the operative complaint."

The undersigned questions how an absent class member would know what claims fall within the category of "similar" to the other sources of law enumerated in the Class Release.  Without knowing what claims are deemed "similar," the class member has no way of knowing what claims they are agreeing to release.  Beyond the inclusion of the vague term "similar," the Class Release is overbroad: it releases claims under entire areas of law such as "state or federal law, statutory, constitutional, contractual or common law" and types of relief that Plaintiff did not allege in his First Amended Complaint and did not litigate in this action.  (Proposed Settlement § I.3, Doc. 23-1 at 33.)  This does not comport with due process.  *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811–12 (1985) (holding that, to satisfy due process, notice "must be the best practicable, 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections' ") (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)); *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015) (noting the "unique due process concerns for absent class members" and commenting that "the district court has a fiduciary duty to look after the interests of those absent class members") (quoting *Hanlon*, 150 F.3d at 1026); *Bond v. Ferguson Enters., Inc.*, No. 1:09–cv–01662 OWW MJS, 2011 WL 284962, at *7 (E.D. Cal. Jan. 25, 2011) ("This form of release is overbroad by arguably releasing all unrelated claims up to the date of the Agreement"); *Logan*

*v. Hargraves*, No. CV-04-0214-FVS, 2008 WL 11425713, at *2 (E.D. Wash. Sept. 25, 2008) ("[W]here the terms of a settlement involve the release of claims, the settlement notice must clearly identify the claims being released.").

In virtually every settlement it will be in a defendant's interest to frame the release of claims as broadly as possible. While a plaintiff might not see a downside in waiving claims he had no interest in litigating, this is the sort of behavior about which reviewing courts must be vigilant, because it is suggestive of collusion. *See, e.g., Belew v. Brink's, Inc.*, 721 F. App'x 734, 735 (9th Cir. 2018) ("One indication of collusion is an overbroad release of claims."); *Ambrosino v. Home Depot U.S.A., Inc.,* Civil No. 11cv1319 L(MDD), 2014 WL 1671489, at *2 (S.D. Cal. Apr. 28, 2014) ("Courts have found that overly broad release provisions, which release a Defendant from all claims to settle their wage claims, including claims that are unrelated to the claims asserted in the complaint, are improper in FLSA and class action settlements.") (collecting cases). Here, individual Settlement Class members may have claims, wholly unrelated to those that are the subject of this action, that they are unknowingly releasing as a result of the Proposed Settlement. The overly broad release of claims that are unrelated, that have not been litigated, alleged, or valued, and of which class members cannot know the full extent, is yet another deficiency that prevents the undersigned from recommending approval of the Proposed Settlement. *See Kempen v. Matheson Tri-Gas, Inc.*, No. 15-cv-00660-HSG, 2016 WL 4073336, at *9 (N.D. Cal. Aug. 1, 2016) ("Courts in this district routinely reject proposed class action settlement agreements that try to release all claims in a wage-and-hour case relating to compensation as overbroad and improper."); *Boyd v. Avanquest N. Am. Inc.*, No. 12-cv-04391-WHO, 2015 WL 4396137, at *1 (N.D. Cal. July 17, 2015) (denying preliminary settlement approval because "there are 'obvious deficiencies' in the proposed Settlement Agreement," "namely, the overly broad release provision"); *Bond v. Ferguson Enters., Inc.,* No. 1:09-cv-01662 OWW MJS, 2011 WL 284962, 2011 WL 284962, at *7 (E.D. Cal. Jan. 25, 2011) (noting that the proposed release was overbroad because it did "not appropriately track the extent and breadth of Plaintiffs' allegations in this case and releases unrelated claims of any kind or nature that class members may have against defendants"); *see also Christensen v. Hillyard, Inc.*, No. 13-cv-04389 NC, 2014 WL 3749523, at

*1 (N.D. Cal. July 30, 2014) (rejecting settlement approval because release of claims was "overly broad").

### 3. Opt-Out Procedure

Due process also requires that any class member bound by a class action settlement, at a minimum, be afforded the opportunity "to remove himself from the class." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 848 (1999) (citation and internal quotation marks omitted). Here, the Proposed Settlement is devoid of any provision that would exclude members from the Settlement Class who do not receive the notice of this litigation.

Unless a class member elects to opt-out of the settlement, according to the Proposed Settlement, they are subject to the above-described release. (Proposed Settlement §§ VI.2, VI.3, X.1, Doc. 23-1 at 45–47, 52.) A class member cannot opt out of the litigation, however, unless they submit a request to be excluded (see id. § VI.3, Doc. 23-1 at 46–47), and a class member cannot request to be excluded unless they have notice of the litigation. Under the Proposed Settlement, the settlement administrator would send a notice form to the last-known address of each class member via first-class mail. (*Id.* § VI.2, Doc. 23-1 at 45–46.) In the event the any notice mailed to a class member is returned as undeliverable, the administrator shall perform a "skip trace search" and seek an "address correction" for such class member, at which time a second notice will be mailed. (Id. § VI.3, Doc. 23-1 at 46.) The Proposed Settlement does not address situations where no address correction is obtained as a result of the skip trace search, or where the second class notice is returned as undeliverable. In those situations, due process would require those class members be excluded from the Settlement Class. *See, e.g., Sanchez*, 2015 WL 4662636, at *12 . Because the Proposed Settlement does not exclude from it any class member whose class notice is returned as undeliverable by the post office (either on the first or second attempt), the undersigned cannot conclude that the Proposed Settlement affords minimum due process to each of the putative class members.

### 4. Attorney's Fees

Under the terms of the Proposed Settlement, Plaintiff's counsel will make a separate application to the Court for an award of attorney's fees "up to" one-third of the Gross Settlement.

(Decl. of Craig J. Ackermann ¶ 51, Doc. 23-1 at 17.)  It is unclear what is meant by "up to," and the undersigned assumes that Plaintiff will be requesting 33.3 percent.

When a negotiated class action settlement includes an award of attorney's fees, the fee award must be evaluated in the overall context of the settlement.  *Knisley v. Network Assocs.*, 312 F.3d 1123, 1126 (9th Cir. 2002).  At the same time, the court "ha[s] an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *Bluetooth*, 654 F.3d at 941; *see also Zucker v. Occidental Petroleum Corp.*, 192 F.3d 1323, 1328–29 (9th Cir. 1999).  Where, as here, fees are to be paid from a common fund, the relationship between the class members and class counsel "turns adversarial." *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994).  As a result, the district court must assume a fiduciary role for the class members in evaluating a request for an award of attorney fees from the common fund. *Id.*; *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 968 (9th Cir. 2009).

The Ninth Circuit has approved two methods for determining attorney's fees in cases where the attorney's fee award is taken from the common fund set aside for the entire settlement: the "percentage of the fund" method and the "lodestar" method.  *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) (citation omitted). The district court retains discretion in common fund cases to choose either method.  *Id.*; *Vu v. Fashion Inst. of Design & Merch.*, No. CV 14-08822 SJO (EX), 2016 WL 6211308, at *5 (C.D. Cal. Mar. 22, 2016). Under either approach, "[r]easonableness is the goal, and mechanical or formulaic application of either method, where it yields an unreasonable result, can be an abuse of discretion." *Fischel v. Equitable Life Assurance Soc'y of the U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002).

Under the percentage of the fund method, the court may award class counsel a given percentage of the common fund recovered for the class.  *Id.*  In the Ninth Circuit, a twenty-five percent award is the "benchmark" amount of attorney's fees, but courts may adjust this figure upwards or downwards if the record shows "special circumstances justifying a departure." *Id.* (quoting *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990)). Percentage awards of between twenty and thirty percent are common. *See Vizcaino*, 290 F.3d at

1047; *In re Activision Sec. Litig.*, 723 F. Supp. 1373, 1377 (N.D. Cal. 1989) ("This court's review of recent reported cases discloses that nearly all common fund awards range around 30% even after thorough application of either the lodestar or twelve-factor method."). Nonetheless, an explanation is necessary when the district court departs from the twenty-five percent benchmark. *Powers v. Eichen*, 229 F.3d 1249, 1256–57 (9th Cir. 2000).

To assess whether the percentage requested is reasonable, courts may consider a number of factors, including:

> [T]he extent to which class counsel achieved exceptional results for the class, whether the case was risky for class counsel, whether counsel's performance generated benefits beyond the cash settlement fund, the market rate for the particular field of law (in some circumstances), the burdens class counsel experienced while litigating the case (e.g., cost, duration, foregoing other work), and whether the case was handled on a contingency basis.

*In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 954–55 (9th Cir. 2015) (internal quotation marks omitted). The Ninth Circuit has permitted courts to award attorney's fees using this method "in lieu of the often more time-consuming task of calculating the lodestar." *Bluetooth*, 654 F.3d at 942.

Plaintiff brings various state law claims and, under California law, "[t]he primary method for establishing the amount of reasonable attorney fees is the lodestar method." *In re Vitamin Cases*, 110 Cal. App. 4th 1041, 1053 (2003) (internal quotation marks and citations omitted). The court determines the lodestar amount by multiplying a reasonable hourly rate by the number of hours reasonably spent litigating the case. *See Ferland v. Conrad Credit Corp.*, 244 F.3d 1145, 1149 (9th Cir. 2001). The product of this computation, the "lodestar" amount, yields a presumptively reasonable fee. *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013); *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 978 (9th Cir. 2008). The Ninth Circuit has recommended that district courts apply one method but cross-check the appropriateness of the amount by employing the other as well. *See Bluetooth*, 654 F.3d at 944

In the Ninth Circuit, courts typically calculate 25% of the common fund as the "benchmark" for a reasonable fee award providing adequate explanation in the record for any special circumstances that justify departure. *Id.* at 942; *Staton*, 327 F.3d at 952; *Six (6) Mexican Workers*,

904 F.2d at 1311. Here, Plaintiff's fee amount is above this benchmark. Plaintiff's motion does not demonstrate justification to depart higher than 25 percent, particularly in light of the relatively early stage of this action, where settlement was reached prior to class certification. It also does not include evidence of the actual number of hours worked in this action for the undersigned to calculate the lodestar amount to cross-check the appropriateness of a departure from the benchmark of 25 percent. As for Plaintiff's counsel's 2018 billable rate of $717 per hour, see Decl. of Craig J. Ackermann ¶ 53, the undersigned notes that it is not in accord with the market rate in the Fresno Division of the Eastern District of California for similar services by lawyers of reasonably comparable skill, experience and reputation. *Blum v. Stenson*, 465 U.S. 886, 895–96, & n.11 (1984). *See Silvester v. Harris*, No. 1:11–CV–2137 AWI SAB, 2014 WL 7239371 at *4 (E.D. Cal. Dec. 2014) (concluding that "hourly rates generally accepted in the Fresno Division for competent experienced attorneys [are] between $250 and $380, with the highest rates generally reserved for those attorneys who are regarded as competent and reputable and who possess in excess of 20 years of experience.").

In light of the foregoing, the undersigned cannot recommend approval of the attorney's fee award based on the record before it. Should Plaintiff renew his motion for preliminary approval and seek attorney's fees in excess of 25 percent of the gross settlement, counsel shall explain the "special circumstances justifying a departure" from the benchmark, s*ee Bluetooth*, 654 F.3d at 942, and include sufficient information to enable the Court to cross-check the requested amount with the lodestar amount based upon counsels' submission in order to determine whether the award of an above-benchmark percentage in fees is reasonable. *See Powers*, 229 F.3d at 1256-57 (noting that an explanation is necessary when the district court departs from the twenty-five percent benchmark).

### 5. Incentive Award

Plaintiff also requests that the Court approve an incentive payment in an amount "up to" $10,000 to be awarded to Roderick Murray as named plaintiff (the "Incentive Award"). (Proposed Settlement § IV.2, Doc. 23-1 at 41.) Without clarification as to what is meant by "up to," the undersigned assumes that Plaintiff will be requesting $10,000.

A district court may award incentive payments to named plaintiffs in class action cases. *Rodriguez*, 563 F.3d at 958–59. The purpose of incentive awards is to "compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaking in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Id.* To justify an incentive award, a class representative must present "evidence demonstrating the quality of plaintiff's representative service," such as "substantial efforts taken as class representative to justify the discrepancy between [his] award and those of the unnamed plaintiffs." *Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 669 (E.D. Cal. 2008). Such incentive awards are particularly appropriate in wage-and-hour actions where a plaintiff undertakes a significant reputational risk in bringing suit against her former employer. *Rodriguez*, 563 F.3d at 958–59.

The Ninth Circuit has emphasized, however, that "district courts must be vigilant in scrutinizing all incentive awards." *Radcliffe v. Experian Info. Sols., Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013) (internal quotation marks and citation omitted). In keeping with that admonition, district courts have declined to approve incentive awards that represent an unreasonably high proportion of the overall settlement amount or are disproportionate relative to the recovery of other class members. *See Ontiveros v. Zamora*, 303 F.R.D. 356, 365–66 (E.D. Cal. 2014) (finding an incentive award of $20,000, comprising 1% of the common fund, to be excessive under the circumstances, and reducing the award to $15,000, where class representative spent 271 hours on the litigation and relinquished the opportunity to bring several of his own claims in order to act as class representative); *see also Ko v. Natura Pet Prods.*, Inc., No. C 09–2619 SBA, 2012 WL 3945541, at *15 (N.D. Cal. Sept. 10, 2012) (holding that an incentive award of $20,000, comprising one percent of the approximately $2 million common fund was "excessive under the circumstances" and reducing the award to $5,000); *Wolph v. Acer Am. Corp.*, No. C 09–01314 JSW, 2013 WL 5718440, at *6 (N.D. Cal. Oct. 21, 2013) (reducing the incentive award to $2,000 where the class representatives did not demonstrate great risk to finances or reputation in bringing the class action). In reducing the award, courts have noted that overcompensation of class representatives could encourage collusion at the settlement stage of class actions by causing a

divergence between the interests of the named plaintiff and the absent class members, destroying the adequacy of class representatives. *See Staton*, 327 F.3d at 977–78; *see also Radcliffe*, 715 F.3d at 1165.

Here, the Proposed Settlement provides for a maximum Incentive Award of $10,000. Plaintiff represents that the award is intended to compensate him for his active participation in the investigation of the issues in this case, in reviewing pleadings and responding to discovery, and in the mediation leading to the Proposed Settlement. (Decl. of Roderick Murray ¶¶ 8, 12, Doc. 23-3 at 3, 4.) Plaintiff also notes that the class representative undertook a significant reputational risk by bringing suit against Defendant. (*Id.* at 4.)

The undersigned finds that the proposed $10,000 Incentive Award appears to be excessive under the circumstances of the case. It is two times the amount that the Ninth Circuit has considered reasonable. *See Resnick v. Frank (In re Online DVD–Rental Antitrust Litig.)*, 779 F.3d 934, 947 (9th Cir.2015). It also constitutes 2.8 percent of the Gross Settlement and is more than 40 times higher than the estimated $246.45 average payment for the other class members. *See Sandoval v. Tharaldson Emple. Mgmt.*, No. EDCV 08-482-VAP (OPx), 2010 WL 2486346, at *9–10 (C.D. Cal. June 15, 2010) (collecting cases and concluding that plaintiff's request for an incentive award representing one percent of the settlement fund was excessive). *See also Sanchez,* 2015 WL 4662636, at *20–21 (recommending $10,000 incentive award payment to named plaintiff be reduced to $7,500), report and recommendation adopted, No. 1:14-CV-797-AWI-MJS, 2015 WL 5138101 (E.D. Cal. Aug. 26, 2015). In addition, Plaintiff's statement in his declaration regarding the unspecified "other drivers" (see Section III.A.4, *supra*) suggests the Incentive Award may not adequately reflect his participation in the lawsuit.

As with the attorney's fees award, the undersigned cannot recommend approval of an Incentive Award in the amount of $10,000 at this time. Should Plaintiff renew his request for an incentive award that amounts to a similarly high proportion of the overall settlement amount or is disproportionate relative to the recovery of other class members, he shall submit evidence that the requested award is warranted here, including evidence of the specific amount of time Plaintiff spent on the litigation, the particular risks and burdens carried by Plaintiff as a result of the

litigation, and the particular benefit that Plaintiff provided to counsel and the class as a whole throughout the litigation.

### 6. Other Issues

#### a. *Cy Pres* Distribution

The Proposed Settlement provides that "[u]nclaimed Funds returned as undeliverable and California Individual Settlement Payment checks remaining un-cashed for more than 180 days after issuance will be disbursed subject to the provisions of California Code of Civil Procedure § 384(b)(3), with that portion of the unclaimed funds allocated under Section 384(b)(3)(C) allocated to the Justice Gap Fund established by the California State Bar." (Proposed Settlement § VII.4, Doc. 23-1 at 50.) This *cy pres* provision conforms to an outdated version of Section 384, which was amended effective June 27, 2018. In order for the Court to approve the Proposed Settlement with a *cy pres* distribution provision, it must be amended to bring such provision in compliance with the amended Section 384.[7]

#### b. Class Member Information Sheet

Page 1 of the "Class Member Information Sheet" (Doc. 23-1 at 72) indicates that the case is pending in the "United States Superior Court, Eastern District of California." This appears to be a typographical error that needs to be corrected, should the parties wish to renew their request for preliminary approval of a settlement.

### IV. CONCLUSION AND RECOMMENDATION

The undersigned finds that Plaintiff has not demonstrated that conditional class certification under Rule 23(a) and (b)(3) or preliminary approval of the Proposed Settlement is warranted. While the undersigned is mindful of the strong judicial policy favoring settlements, *see Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992), this settlement cannot be approved without additional information and significant amendment. It is therefore

---

[7] As amended, Section 384 now states that it is "the policy of the State of California to ensure that the unpaid cash residue . . . in class action litigation are distributed . . . in a manner designed either to further the purposes of the underlying class action ... or to promote justice for all Californians." Cal. Code Civ. Proc. § 384(a). The revised section goes on to require a court to set a date when the parties are to report to the court the total amount paid to class members. *Id.* § 384(b). After the report is received, the court is directed to amend the judgment to direct the defendant to pay the sum of the unpaid residue, plus interest, to nonprofit organizations or foundations to support projects that will benefit the class or similarly situated persons. *Id.*

**RECOMMENDED** that Plaintiff's motion for preliminary approval of a class action settlement (Doc. 23) be **DENIED**, without prejudice to Plaintiff renewing the motion to address the issues and concerns identified herein.

These findings and recommendation are submitted to the district judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l)(B) and this Court's Local Rule 304. Within twenty-one (21) days of service of this recommendation, any party may file written objections to these findings and recommendation with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." The district judge will review the magistrate judge's findings and recommendation pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir.1991)).

IT IS SO ORDERED.

Dated:   **November 15, 2019**                    /s/ *Sheila K. Oberto*
                                             UNITED STATES MAGISTRATE JUDGE